# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| ————————————————————— x | |
| : | Case No. _____ |
| TARIQ HABASH, DELIA GOVEA, : | |
| ANDREW PHILLIPS, and CATALINA : | |
| TORRES, on behalf of themselves and all : | |
| others similarly situated, : | CLASS ACTION COMPLAINT |
| : | |
| *Plaintiffs*, : | <u>DEMAND FOR JURY TRIAL</u> |
| : | |
| v. : | |
| : | |
| URNER BARRY PUBLICATIONS, INC., : | |
| CAL-MAINE FOODS, INC., DAYBREAK : | |
| FOODS, INC.; HILLANDALE FARMS : | |
| CORPORATION, OPAL FOODS LLC, and : | |
| ROSE ACRE FARMS, INC., : | |
| : | |
| *Defendants.* : | |
| ————————————————————— x | |

Plaintiffs Tariq Habash, Delia Govea, Andrew Phillips, and Catalina Torres (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants Urner Barry Publications, Inc. ("Urner Barry"), Cal-Maine Foods, Inc. ("Cal-Maine"), Daybreak Foods, Inc. ("Daybreak"), Hillandale Farms, Inc. ("Hillandale"), Opal Foods LLC ("Opal") and Rose Acre Farms, Inc. ("Rose Acre"), as well as Co-Conspirator trade association United Egg Producers, Inc. d/b/a Egg Farmers of America ("UEP"),   for violations of the antitrust laws of the United States, as well as the antitrust, consumer protection and common law of the states set forth herein in connection with Defendants' conspiracy to fix prices of eggs (defined below) in the United States ("Relevant Market").

Plaintiffs make the following allegations based upon personal knowledge as to themselves, as well as upon information and belief of counsel as follows:

## **INTRODUCTION**

*Industrial egg producers seem to be feeding the American public a phony narrative about why egg prices are so high and could be using anticompetitive pricing tactics to force consumers and retailers to shell out more for eggs.*[1]

United States Senator Jack Reed (Rhode Island)

February 6, 2023

1.      Cal-Maine, Daybreak, Hillandale, Opal Foods and Rose Acre, are five of the largest egg producers of Eggs in the United States.[2]  These Egg producers, along with the other members

---

[1] Sen. Jack Reed, "*Reed: Industrial Egg Producers Price Hikes Are Suspiciously High & Federal Government Should Help Rein in Unfair Market Prices*," PRESS RELEASE (ONLINE) (February 6, 2023), at https://www.reed.senate.gov/news/releases/reed-industrial-egg-producers-price-hikes-are-suspiciously-high-and-federal-government-should-help-rein-in-unfair-market-practices.

[2] Shell eggs are comprised of "table eggs" (eggs which are purchased by retail entities, like grocery stores, to resale to the consuming public) and "breaking eggs" (eggs which are purchased by food service entities for processing). Generally, egg products are defined as breaking eggs which have been removed from their shells and then

of their trade association, UEP, collectively control over 90% of the Eggs produced in the Relevant Market.[3]

2.      Starting as late as February 1, 2022 and continuing to the present (the "Class Period"), Egg producers and over 90% of the Relevant Market (including many of the other members of UEP) have used a shared benchmark analysis platform called Urner Barry (now called "Expana") to collusively fix, raise, maintain and stabilize the supply and price of Eggs sold in the United States above competitive levels.[4]  During the Class Period, according to the United States Bureau of Labor Statistics, the price of eggs soared from under $2 per dozen to as high as $6.22 per dozen in March of 2025.[5]

3.      While the Relevant Market faced minor headwinds due to an outbreak of highly pathogenic avian influenza ("Avian Flu"), the supply of Eggs in the Relevant Market remained relatively stable.  Despite this, Defendants, UEP and other egg producers used Avian Flu as a cover for their conspiracy to fix, raise, maintain and stabilize Egg prices.  At the behest of consumers, this price-fixing conspiracy enabled Egg producers in the Relevant Market to delegate pricing to a common decisionmaker, enabling producers to drastically inflate prices of Eggs without fear that their competitors would undercut their prices and capture market share.

4.      Yet, Defendants, UEP and other egg producers have used (and continue to use) Avian Flu as a pretext for supracompetitive pricing.  UEP, which partners with and promotes the

---

[3] https://unitedegg.com/about/, (last accessed Nov, 17, 2025).

[4] *Kraft Foods Global, Inc,, et al. v. United Egg Producers, Inc.*, Case No. 1:11-cv-08808 (N.D. Ill. 2011), ECF No. 1, at ¶ 94.

[5] United States Bureau of Labor Statistics, Average Price: Eggs, Grade A, Large (Cost Per Dozen) in U.S. City Average, at https://fred.stlouisfed.org/series/APU0000708111 (last accessed Nov. 17, 2025).

processed into dried, frozen or liquid form.  Shell eggs in this context includes eggs and egg products which are produced at traditional commercial factory farms and cage free farms.

use of Urner Barry while acting as a unified voice of the egg industry, actively pushes this narrative.[6]   American Egg Board, the lobbying arm of UEP, released a statement on March 12, 2025, "[t]he disruption to our nation's egg supply and the resulting price volatility we're all experiencing are due to the ongoing impact of highly pathogenic avian influenza […] which is now in its fourth year."[7]

5.     This, however, defies logic as well as basic laws of supply and demand.

6.     Cal-Maine, the largest Egg producer in the Relevant Market, did not experience significant Avian Flu outbreaks (or any at all) in their egg-laying flocks for significant portions of the Class Period.  In 2023, Cal-Maine had zero Avian Flu outbreaks in its flocks in 2023 and even sold more eggs in 2023 than it did in either 2021 or 2021.[8]   Despite having zero Avian Flu outbreaks in 2023, Cal-Maine's gross profits increased more than seven-fold in 2023 and Cal-Maine sold its conventional eggs for 2.8 times as much as it did in 2021, a year before the Avian Flu came to light.[9] [10]   Throughout the Class Period, Cal-Maine has delegated pricing to Urner Barry.[11]   In Securities Exchange Commission reports, Cal-Maine has stated, "[f]or decades, like other egg producers, Cal-Maine Foods has priced egg sales based on a model utilizing independent,

---

[6] John Todd, "*2006 Urner Barry Executive Conference,*" WATTPOULTRY (ONLINE) (June 16, 2009), at https://www.wattagnet.com/egg/egg-production/article/15471265/2006-urner-barry-executive-conference#:~:text=From%20a%20producer's%20standpoint%20they,alternative%20means%20of%20pricing%20eggs.

[7] "*American Egg Board Comments on Egg Prices – Emily Metz, President and CEO,*" PR NEWSWIRE (ONLINE) (Mar. 12, 2025), at https://www.prnewswire.com/news-releases/american-egg-board-comments-on-egg-prices--emily-metz-president-and-ceo-302400246.html.

[8] "*The Economic Cost of Food Monopolies: The Rotten Egg Oligarchy,*" FOOD & WATER WATCH (ONLINE) (March 2025), at https://www.foodandwaterwatch.org/wp-content/uploads/2025/03/RPT2_2502_EconomicCostEggs.pdf.

[9] *Id.*

[10] *Id.*

[11] https://calmainefoods.gcs-web.com/news-releases/news-release-details/cal-maine-foods-inc-issues-response-texas-attorney-general, (last accessed, Nov. 17, 2025).

third-party market quotes published by Urner Barry, the leading provider of protein market news and information for the food industry."[12]

7.    Other Egg producers, like Hillandale and Opal, have also claimed they have no control over the high prices of Eggs due to the delegation of pricing decisions to Urner Barry.[13] [14]

8.    The Relevant Market has characteristics that make it more susceptible to collusion and enable Defendants, UEP and other Egg producers to implement their price-fixing conspiracy. The Relevant Market has become increasingly more concentrated, with 40% of Eggs being produced by just five egg producers.  Because of the use of Urner Barry by almost every Egg producer as well as promotion of Urner Barry by UEP, which represents over 90% of Egg producers in the Relevant Market, nearly the entirety of egg production in the United States follows the same pricing guidelines to determine how to sell Eggs downstream.  In "follow the leader" fashion, each Egg producer in the United States knows that, in order for the conspiracy to work, that their competitors must also participate.  This is why each producer supplies non-public, confidential data on pricing and supply to Urner Barry.  This conspiracy is facilitated by providing the mechanism (Urner Barry) for Egg producers to exchange this data and monitor their conspiracy.

9.    Moreover, Egg producers have numerous opportunities to directly collude, including at conferences (such as Urner Barry's own annual conference), through the Urner Barry

---

[12] *Id.*

[13] "*Attorney General James Sues One of the Nation's Largest Egg Producers for Price Gouging During the Coronavirus Pandemic,*" Press Release (Online) (August 11, 2020), at https://ag.ny.gov/press-release/2020/attorney-general-james-sues-one-nations-largest-egg-producers-price-gouging.

[14] *State of Minnesota v. Sparboe Farms, Inc.,* Case No. 27-cv-21-10810 (Mn. Ct., Hennepin Cnty. 2021), at https://www.ag.state.mn.us/Office/Communications/2021/docs/Sparboe_Complaint.pdf, (last accessed, Nov. 17, 2025).

platform (which allows participants in the Relevant Market to coordinate messaging through updates and webinars) and through the guidance of UEP itself.

10.    Defendants, UEP and the other Egg producers unlawful, anticompetitive actions had the intended purpose and effect of artificially fixing, raising, maintaining and stabilizing the price and supply of Eggs.  Among the victims of the conspiracy are U.S. consumers of Eggs, such as Plaintiffs and Class members (defined below).  In the absence of this conspiracy. Plaintiffs and Class members would have paid less for Eggs than they did during the Class Period.

11.    Plaintiffs, on behalf of themselves and Class members, bring this proposed class action on behalf of indirect purchasers of Eggs for redress of the injury and damages suffered and continue to suffer by reason of Defendants' continuing violations of law as well as to restore competition in the Relevant Market.

## JURISDICTION, VENUE and INTERSTATE COMMERCE

12.    This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26).  Plaintiffs' Sherman Act claim seeks injunctive relief, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees, and Plaintiffs' state law claims seek damages (including treble damages), injunctive relief, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees.

13.    *Subject Matter and Supplemental Jurisdiction.*  Plaintiffs bring this Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under the state antitrust laws and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337(a) and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under the federal antitrust laws, as Plaintiffs bring

this Action to remedy violations of Section 1 of the Sherman Act.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because all of their claims arise from the same facts and circumstances and form part of the same case or controversy.

14.    Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act of 2005 ("CAFA").  *See*, 28 U.S.C. § 1332(d). This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendant.  Namely, Plaintiffs are residents of the District of Columbia, California, New York and Florida, whereas Defendants are headquartered in Indiana, New Jersey, Mississippi, Minnesota and Pennsylvania.

15.    *Personal Jurisdiction.*  This Court has personal jurisdiction over the litigants under Section 12 of the Clayton Act (15 U.S.C. § 22 and 28 U.S.C. § 1391) because Defendant Daybreak maintains its facilities in this District; additionally, Defendants transacted business in this District and a substantial portion of the activity at issue in this case occurred here, in this District.  This Court also has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) and 15 U.S.C. § 22, which permit bringing an antitrust lawsuit against any corporation in any district where that corporation may be found or transacts business as well as allows process in such cases to be served in any district where that corporation may be found.

16.    *Venue.*  Venue is proper in this District under Sections 4, 12 and 15 of the Clayton Act (15 U.S.C. §§ 15, 22 and 16 and 28 U.S.C. §1391(b), (c) and (d), because Defendant Daybreak maintains its facilites in this District, one or more Defendants resides in or transacts business in

this District (or is licensed to do business in this District) and a substantial portion of the interstate commerce described herein was carried out in this District.

17.    *Interstate Commerce.*  Defendants' unlawful, anticompetitive conduct as alleged herein substantially impacts interstate trade and commerce by harming competition and consumers alike by raising prices, restricting output and throttling innovation throughout the United States, causing injury to Plaintiffs and the geographically dispersed members of the Class.

## PARTIES

## PLAINTIFFS

*Plaintiff Habash*

18.    Plaintiff Habash is domiciled in Washington, District of Columbia.

19.    Plaintiff Habash, during the Class Period, purchased dozens of Eggs at retail produced by one or more Defendants in the District of Columbia and in Maryland, including at numerous different retailers.  As such, Plaintiff Habash is an indirect purchaser of Eggs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct.  But for Defendants' conduct, Plaintiff Habash would have paid a more competitive (or lower) price for Eggs than he otherwise did.

20.    As a result of Defendants' anticompetitive conduct, Plaintiff Habash has paid and continues to pay higher prices for Eggs at retail, like other members of the Class throughout the United States.

*Plaintiff Govea*

21.    Plaintiff Govea is domiciled in Los Angeles, California.

22.    Plaintiff Govea, during the Class Period, purchased dozens of Eggs produced by one or more Defendants at retail in California, including at numerous different retailers.  As such,

Plaintiff Govea is an indirect purchaser of Eggs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiff Govea would have paid a more competitive (or lower) price for Eggs than she otherwise did.

23.     As a result of Defendants' anticompetitive conduct, Plaintiff Govea has paid and continues to pay higher prices for Eggs at retail, like other members of the Class throughout the United States.

*Plaintiff Phillips*

24.     Plaintiff Phillips is domiciled in Long Island, New York.

25.     Plaintiff Phillips, during the Class Period, purchased dozens of Eggs produced by one or more Defendants at retail in New York, including at numerous different retailers. As such, Plaintiff Phillips is an indirect purchaser of Eggs during the Class Period and paid supracompetitive prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiff Phillips would have paid a more competitive (or lower) price for eggs than he otherwise did.

26.     As a result of Defendants' anticompetitive conduct, Plaintiff Phillips has paid and continues to pay higher prices for Eggs at retail, like other members of the Class throughout the United States.

*Plaintiff Torres*

27.     Plaintiff Torres is domiciled in Orlando, Florida.

28.     Plaintiff Torres, during the Class Period, purchased dozens of Eggs produced by one or more Defendants at retail in Florida, including at numerous different retailers. As such, Plaintiff Torres is an indirect purchaser of Eggs during the Class Period and paid supracompetitive

prices as a result of Defendants' individual and collective conduct. But for Defendants' conduct, Plaintiff Torres would have paid a more competitive (or lower) price for Eggs than she otherwise did.

29.     As a result of Defendants' anticompetitive conduct, Plaintiff Torres has paid and continues to pay higher prices for Eggs at retail, like other members of the Class throughout the United States.

## DEFENDANTS

*Defendant Urner Barry Publications, Inc.*

30.     Defendant Urner Barry is headquartered in Toms River, New Jersey.

31.     Urner Barry is currently owned, operated and/or otherwise affiliated with Five Arrows Managers (USA) LLC ("Five Arrows") is a Delaware limited liability company with its principal place of business located in New York, New York. Five Arrows is the alternative assets arm of Rothschild & Co.[15]

32.     Since Five Arrows' founding in 2009, Five Arrows has over 28.2 billion Euro assets under management, had an annual revenue of 323 million Euro in 2024, has six offices globally and a staff of over 280 people.[16]

33.     According to Rothschild & Co's 2022 Annual Report, Five Arrows acquired Urner Barry rival Mintec in January of 2022.[17] At the time, Rothschild & Co. heralded the transaction:

> Mintec offers 15,000+ datasets on food ingredients and non-food raw materials. The data spans 650+ commodity types and serves the [$9 trillion U.S.] food

---

[15] https://rothschildandcopublications.foleon.com/annual-review/2024-en/business-five-arrows, (last accessed Nov. 18, 2025).

[16] *Id.*

[17] Rothschild & Co. 2022 Annual Report (U.K.) (2022), at https://www.rothschildandco.com/siteassets/publications/rothschild_and_co/2022/full_year_results/en_2022_annual_report.pdf.

industry, using an unparalleled range of data sources, including proprietary data and prices.  Mintec's cloud-based SaaS platform overlays a wide array of granular agri-data with analytics software, user interface and capabilities.  Its functionalities include plotting tools, dashboards, forecasts, cost models and hedging tools, creating an overall platform essential to the procurement, risk management and negotiation processes of food retailers and manufacturers globally.[18]

34.    In February of 2022, it was announced that Five Arrows would acquire a majority stake in Mintec from another investment firm, Synova.[19]  At the time, Mintec's chief executive officer Spencer Wicks lauded Synova's willingness to guide Five Arrows and Mintec to acquire the invaluable "commercial and proprietary data strategy" that Mintec had developed.[20]

35.    Shortly thereafter, on January 10, 2023, Five Arrows' announced that it had acquired AgriBriefing – the corporate parent for Urner Barry's Urner Barry Price Index – and that it would combine Urner Barry with Mintec.[21]  At the time, Mintec's chief executive officer. Spencer Wicks stated, "[a]ll of our combined customers can now further optimize their business strategy with access to even more robust and reliable price data and analytics for the key commodities they buy, sell and consume.  By combining the extensive range of unique data and market intelligence available, we will be offering access to the most comprehensive solution and resource for businesses to navigate the global pressures impacting their costs and overall profitability."[22]  Rory Brown, then-chief executive officer of AgriBriefing, stated at the time,

---

[18] *Id.*

[19] "*Synova sells majority stake in Mintec*," Press Release (Online) (February 2022), at https://www.synova.pe/news/synova-sells-majority-stake-in-mintec.

[20] *Id.*
[21] Sam Danley, "*Mintec to combine with Urner Barry*," FOOD BUSINESS NEWS (ONLINE) (January 10, 2023), at https://www.foodbusinessnews.net/articles/22992-mintec-to-combine-with-urner-barry.

[22] *Id.*

"[t]his partnership is a fantastic combination of commodity intelligence companies that ensures our customers can stay on top of commodity price challenges and opportunities related to cost."[23]

36.    According to a June 2024 statement on Expana's website by Expana's chief executive officer Spencer Wicks, "Expana is ultimately owned and controlled by [] an investment fund operated by Five Arrows Principal Investments."[24]

37.    According to Mintec, Wicks in February 2024:

Mintec enables the world's largest agri-food and manufacturing brands to implement more efficient and sustainable procurement strategies.  We do this through our innovative [software as a service] platform], Mintec Analytics, which delivers proprietary market prices and analysis for more than 16,000 food ingredients and associated materials.  Our data and solutions empower our customers to understand prices better, analyze their spending and negotiate confidently[.][25]

38.    Defendant's Expana product, using the methodology and technology from both Urner Barry and Mintec, provides a conduit to price fixing which allows the Egg Producers to collusively fix prices and collaborate on competitively sensitive topics, like supply and output of Eggs.

39.    In addition to Urner Barry's pricing platform (and the communication process necessary to obtain the competitively sensitive information fed into the platform), Urner Barry also provides other mechanisms that allow for collusion and the opportunity to collude.  These other mechanisms include: (a) quarterly reports through Urner Barry's "Reporter" publication,

---

[23] *Id.*

[24] Expana Modern Slavery and Human Trafficking Statement of June 2024, EXPANA (ONLINE) (June 2024), at https://www.expanamarkets.com/wp-content/uploads/2024/06/Expana_Modern-Slavery-Act-2015_-slavery-and-human-trafficking-statement-FY2024.pdf.

[25] "*Mintec completes four IOSCO accreditation for proprietary agrifood prices*," EIN Newswire (Online) (February 13, 2024), at https://www.ozarksfirst.com/business/press-releases/ein-presswire/688089970/mintec-completes-fourth-iosco-accreditation-for-proprietary-agrifood-prices/.

which gives guidance to Egg producers and other stakeholders about Egg price, production and supply; (b) conferences, including the Urner Barry Global Protein Summit and Urner Barry's Annual Executive Conference, where Egg prices are openly discussed and are topics of panel discussion; and (c) collaborations with UEP that promote the use of Urner Barry by UEP's members.

*Defendant Cal-Maine*

40.     Defendant Cal-Maine is a publicly traded company (NASDAQ: CALM) headquartered in Ridgeland, Mississippi.

41.     According to Cal-Maine, Defendant is the largest producer and distributor of Eggs in the United States.[26]  In April of 2025, Cal-Maine confirmed that it was cooperating with a Department of Justice investigation "into high egg prices and whether producers have conspired to raise them."[27]

42.     Throughout the Class Period, Cal-Maine has delegated pricing to Urner Barry.[28]  In 2020, Cal-Maine stated, "[f]or decades, like other egg producers, Cal-Maine Foods has priced egg sales based on a model utilizing independent, third-party market quotes published by Urner Barry, the leading provider of protein market news and information for the food industry."[29]  Additionally Cal-Maine cites to Urner Barry pricing in its investor presentations.[30]

---

[26] "*Cal-Maine Foods Reports Results for Second Quarter Fiscal 2025*" PRESS RELEASE (ONLINE) (January 7, 2025), https://www.calmainefoods.com/press-releases.

[27] "*Largest U.S. egg producer cooperating in Justice Department price probe*," REUTERS (ONLINE) (April 9, 2025), at https://www.reuters.com/world/us/cal-maine-says-cooperating-with-justice-departments-probe-into-high-egg-prices-2025-04-08/.

[28] https://calmainefoods.gcs-web.com/news-releases/news-release-details/cal-maine-foods-inc-issues-response-texas-attorney-general, (last accessed, Nov. 18, 2025).

[29] *Id.*

[30] Investor Presentation of Cal-Maine Foods, Inc. (August 2020), at https://calmainefoods.gcs-web.com/static-files/3775d1a2-4a86-44d4-a3be-22263fc9efb7, at 15.

43.     The brands of eggs sold by Cal-Maine includes Eggland's Best, Land O'Lakes, Farmhouse Eggs, Sunups, Sunny Meadow and 4-Grain.  Cal-Maine participates in a joint venture with Hillandale and Sparboe to produce Eggland's Best and Land O'Lakes eggs.  Cal-Maine also has a number of private label clients, including: Walmart, HEB, Publix, Food Lion, ALDI, Eggs America (US Foods/Sysco), Kroger, CCF Brands, Costco and Wakefern.[31]

44.     Additionally, Cal-Maine calls itself a "proven acquirer with a successful track record and tremendous consolidation opportunities"[32]   From 1989 through 2019, Cal-Maine acquired an ownership stake in at least 22 different major egg producers, representing approximately 47 million layers of egg laying hens.[33]

*Defendant Daybreak*

45.     Defendant Daybreak is headquartered in Lake Mills, Wisconsin and is one of the largest producers of Eggs in the United States.

46.     Throughout the Class Period, Daybreak has delegated pricing to Urner Barry. Daybreak's chief executive officer, William Rehm, has been a guest speaker at the Urner Barry Executive Conference as recently as September 2021; Rehm was also on the Board of Directors for UEP.

---

[31] *Id.,*at 9.

[32] *Id,* at 10.

[33] *Id.*

*Defendant Hillandale*

47.     Defendant Hillandale is headquartered in Greensburg, Pennsylvania and is one of the largest producers of Eggs in the United States.  In March of 2025, Hillandale was acquired by Global Eggs Corporation for approximately $1.1 billion.[34]

48.     Throughout the Class Period, Hillandale has delegated pricing to Urner Barry and even defended itself in a price-gouging lawsuit filed by the Attorney General of the State of New York in 2020 as being unable to control pricing because Urner Barry dictated said pricing.[35]

49.     The brands of eggs sold by Hillandale includes Eggland's Best, Hillandale Farms and Born Free.  Hillandale participates in a joint venture with Cal-Maine and Opal Foods to produce Eggland's Best and Land O'Lakes eggs.

*Defendant Opal Foods*

50.     Defendant Opal Foods is headquartered in Neosho, Missouri.  Opal Foods has acquired numerous large Egg producers, including Sparboe as well as others.

51.     Throughout the Class Period, Sparboe has delegating pricing to Urner Barry.  For example, Sparboe was sued by the Attorney General of Minnesota in 2021 for price-gouging Eggs during the 2020 COVID-19 pandemic.  At the time, an email between Sparboe employees revealed that Sparboe raised prices according to Urner Barry stating, "[t]he UB report from today is very strong […] [t]he last time we had a big financial crisis in 2008, the UB skyrocketed.  Eggs are counter cyclical, and this financial crisis could be worse than 2008, so the impact on egg prices could be the same or greater […] so right now, we would want as many birds laying eggs as

---

[34] Luciana Novaes Magalhaes, "*Global Eggs agrees to buy Hillandale Farms for $1.1 billion*," REUTERS (ONLINE) (March 27, 2025),  https://www.reuters.com/markets/deals/brazils-global-eggs-agrees-buy-hillandale-farms-11-billion-2025-03-27/.

[35] "*Attorney General James Sues One of the Nation's Largest Egg Producers for Price Gouging During the Coronavirus Pandemic*," PRESS RELEASE (ONLINE) (August 11, 2020), at  https://ag.ny.gov/press-release/2020/attorney-general-james-sues-one-nations-largest-egg-producers-price-gouging.

possible […] [l]ets maximize our output-and make sure we are getting every egg in a carton or in a flat."[36]

52.    On March 10, 2020, Sparboe president Beth Sparboe Schnell forwarded a daily afternoon email to a Sparboe sales manager from Urner Barry. Urner Barry's email discussed that reduced outputs as well as heightened demand had "led to strong buying interest" and higher price predictions. When Schnell forwarded the email she wrote: "Here we go! Finally!! Hitting some 52-week highs. You're going to experience the first strong market since you started …. The question is – how high and how long?"[37] The sales manager replied: "I will take the ride!!!! We have been waiting for a long time!"[38]

53.    On March 18, 2020, Schnell boasted that the Urner Barry price index had drastically increased by 21 cents (per dozen eggs) and foreshadowed "$3.00 eggs" as compared to the $1 price point a dozen eggs had been selling for just weeks prior. In response to the email, Schnell's brother, Garth Sparboe, expressed concerns that attorneys general would be carefully analyzing commodities prices, recommended "moderation" and stated "hit[ting] a grand slam price on a load of eggs to the wrong wholesale customer could cause problems."[39]

54.    Critically, Schnell instead opted not to listen to her brother, followed pricing guidelines set by Urner Barry and drastically increased prices – tripling the price of Sparboe eggs from $0.90 per dozen in early March 2020 to $2.96 per dozen by early April 2020.[40]

---

[36] *State of Minnesota v. Sparboe Farms, Inc.,* Case No. 27-cv-21-10810 (Mn. Ct., Hennepin Cnty. 2021), at https://www.ag.state.mn.us/Office/Communications/2021/docs/Sparboe_Complaint.pdf, (last accessed, Nov. 18, 2025).

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

55.    The brands of Eggs sold by Sparboe includes Eggland's Best and Land O'Lakes. Sparboe participates in a joint venture with Cal-Maine and Hillandale to produce Eggland's Best and Land O'Lakes eggs.

*Defendant Rose Acre*

56.    Defendant Rose Acre is headquartered in Seymour, Indiana and is the second largest producer of eggs in the United States.  Rose Acre is registered to do business in Illinois, with facilities in this District.

57.    Throughout the Class Period, Rose Acre has delegated pricing to Urner Barry.

## AGENTS AND CO-CONSPIRATORS

*Co-Conspirator UEP*

58.    Co-Conspirator UEP d/b/a Egg Farmers of America is a trade association that represents over 90% of the United States' Egg producers and is headquartered in John's Creek, Georgia.

59.    UEP acts as a unified voice for the Egg industry and provides guidance on various forms of messaging, rules for cage free and conventional Egg production and a method for Egg producers to be able to communicate concerns about the Relevant Market.

60.    UEP has long advocated and supported the use of Urner Barry's price index in order to keep its members in lockstep in terms of price, production and supply.  According to an economist presentation in 2006, the "pricing procedures from […] Urner Barry are critical […] [Urner Barry is] very valuable to the table egg industry by providing a consistent, independent benchmark for both producers and retailers.  By working with UEP and others, Urner Barry provides industry leadership."[41]

---

[41] John Todd, "*2006 Urner Barry Executive Conference,*" WATTPOULTRY (ONLINE) (June 16, 2009), at https://www.wattagnet.com/egg/egg-production/article/15471265/2006-urner-barry-executive-

61.    UEP's members frequently attend Urner Barry's various conferences; and, UEP president Chad Gregory has had key speaking roles at Urner Barry conferences, including about the topic of Egg prices.

62.    Additionally, during the Class Period, the American Egg Board (which works in tandem with UEP) releases and disseminates Egg industry reports called "U.S. Egg Cost of Production and Prices" that use Urner Barry's pricing index as information.[42]

63.    Presently, UEP has a number of members who are all potential defendants to this action upon further investigation and the exchange of discovery.[43]

*Unnamed Agents and Co-Conspirators*

64.    Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as defendants in this Complaint.

65.    Whenever references I made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affair.

---

conference#:~:text=From%20a%20producer's%20standpoint%20they,alternative%20means%20of%20pricing%20eggs.

[42] *See, e.g.* Maro Ibarburu, "*U.S. Egg Cost of Production and Prices*," THE EGG INDUSTRY CENTER (ONLINE) (January 9, 2024), at https://www.eggindustrycenter.org/media/cms/Costs_and_Prices_for_December_2023__36ED6C7DE3179.pdf.

[43] *See,* **Ex. A.** UEP Certified Companies (report created August 28, 2024), at https://uepcertified.com/wp-content/uploads/2024/10/Find-Your-UEP-Certified-Cage-Free-Producer.pdf.

66.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations and common course of conduct alleged herein.

67.     Defendants are also liable for the acts done in furtherance of the alleged conspiracy by companies acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### *Background of the Egg Market*

68.     Eggs are one of the top selling proteins in the United States. Billions of dollars of Eggs are produced annually within the United States solely for domestic consumption.

69.     Generally, Eggs include both "table eggs" (which are purchased by retail entities for resale to the consuming public) and "breaking eggs" (which are purchased by food service entities for further processing). Egg products are breaking Eggs that have been removed from their shells and processed into dried (powder), frozen or liquid forms. In 2024, there were over 109 billion Eggs produced in the United States (down 1% from 2023) with approximately 93.1 billion of those Eggs being sold as "table eggs." In 2024, the three largest Egg producers were Defendants Cal-Maine, Rose Acre and Daybreak.

70.     According to the USDA, and as a result of elevated prices, the value of overall Egg production in 2024 increased to $21 billion (an overall percentage increase to 17.7% in 2024 as compared to 2023).

71.     Increasingly, the Egg industry has become more consolidated as well as vertically integrated. This means that there are fewer Egg producers in the Relevant Market (largely due to mergers and acquisitions) as well as a more control by the few remaining Egg producers over the entire supply chain from egg laying hen husbandry to Egg hatching through packing, processing and direct transport to retail and food service customers.

*Defendants' Unlawfully Coordinated Their Pricing of Eggs*

72.    Defendants acted (and continue to act) in concert to fix, raise, maintain and/or stabilize the price of Eggs that they produced, distributed, or sold in the Relevant Market.

73.    Beginning as late as February 1, 2022, the way that the Defendants have been able to fix prices in the Relevant Market is by using conduits to price fixing – namely, Urner Barry (and, previously Urner Barry).    While Defendants coordinate prices in lockstep through the exchange of price quotations, supply statistics and output forecasts by using Urner Barry as a middleman, Defendants have hidden behind pretexts including Avian Flu as reasons why the price of Eggs continues to skyrocket.    In reality, Avian Flu is merely a cover for price coordination and the exchange of confidential and competitively sensitive information – allowing Defendants, other Egg producers and UEP to reap supracompetitive prices.

74.    *Egg Producers Unlawfully Collude by Using Urner Barry*.    For over a century, Urner Barry offered egg quotations as the benchmark for pricing of Eggs in the Relevant Market.[44] Today, Urner Barry is a highly complex platform that evaluates numerous data points – both public and confidential – to provide vital pricing indexes to Egg producers in the United States and Europe as well as to provide information on "the most impactful market conditions."[45]    Beginning in the winter of 2022, Urner Barry also began offering Urner Barry's new "Egg Forecast": "[t]his biweekly report features price forecasts for regional shell eggs, breaking stock, egg solids and liquid eggs, as well as confidence intervals, charts and commentary […] there will also be a quarterly webinar providing insight into the current state of the market."[46]

---

[44] https://www.urnerbarry.com/Markets#eggs, (last accessed, Nov. 18, 2025).

[45] *Id.*

[46] Urner Barry's Reporter, (Online) (Winter 2022) (Vol. 17, No. 1), at https://www.urnerbarry.com/reporter/issues/ReporterV17N1_WEB.pdf, at 62.

75.     Using Urner Barry, the Egg producers have delegated Egg pricing and supply to a common decisionmaker, Urner Barry, a price index which provides both current and future supply and pricing information for eggs.[47]   As reported by Food & Water Watch, "[the] 'market price' [for eggs] comes from a private firm [Expana] that publishes price indexes on eggs[.]"[48]  According to this information, "Expana researchers contact companies throughout the egg supply chain, who voluntarily provide data.  This includes data on actual transactions as well as bids and 'market participant assessments.' Expana then distills [] data into 'benchmark' prices in its Urner Barry index, which, in turn, [] influences the prices set by the same producers."[49]  In no uncertain terms, Urner Barry "provides information to egg companies on the pricing direction of their competitors."[50]  And, to the detriment of consumers, the Egg Producers follow.  For example, Cal-Maine openly states in its 2024 Annual Report that the price of shell eggs, "a critical component of revenue to the company" are driven by sales "at prices that take into account, in varying ways, independently quoted wholesale market prices, such as those published by Urner Barry[.]"[51]

76.     According to Urner Barry itself, Urner Barry's market intelligence tools are designed to "maximize profits" by using algorithms to create "predicting price modes for commodity pricing."[52]   Urner Barry promises its clients that it can "negotiate price changes," "improve commodity price understanding," "negotiate prices with confidence," and "help

---

[47] "*The Economic Cost of Food Monopolies: The Rotten Egg Oligarchy*," FOOD & WATER WATCH (ONLINE) (March 2025), at https://www.foodandwaterwatch.org/wp-content/uploads/2025/03/RPT2_2502_EconomicCostEggs.pdf.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] Cal-Maine Foods, Inc., SECURITIES AND EXCHANGE COMMISSION REPORT, FORM 10-K (June 1, 2024), at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000016160/000156276224000177/calm2024060110K.htm.

[52] https://www.expanamarkets.com/product/features/commodity-price-forecasts/, (last accessed, Nov. 18, 2025).

businesses make informed decisions, mitigate risks and stay head of market trends."[53]  To do this, Urner Barry collects a massive amount of non-public, competitively sensitive information from Egg producers and then distills all of this into dashboards and forecasts to help Egg Producers navigate and mitigate price and supply risks.  As Urner Barry states about its functionality on its website:

> Each trading day, both solicited and unsolicited information is gathered by our highly experienced market reporting staff.  Industry participants on both sides of the sale are contacted throughout the day to ensure that our reporters are kept current on the trading levels as well as the market's potential direction and movement.  All trading participants and their reporting information are kept strictly confidential.  Data collected includes, but is not limited to, what products are being traded, what products are being offered and by whom, the price at which product is being offered, what levels are being bid and by whom, shipping dates and all other pertinent information which will aid in the finalization of our quotations.[54]

77.    On a granular level, and according to a 2022 third-party audit of Urner Barry's price reporting agency principles (the datapoints which underlie the Urner Barry platform performed by BDO), the following confidential and non-public data is collected by Urner Barry's reporters on a daily basis:

    a.  When a transaction is initiated;

    b.  What products were traded;

    c.  What levels are being bid on each product;

    d.  Who is bidding or offering at said level;

    e.  When the product will ship; and

---

[53] *Id.*

[54] *"The Urner Barry Story: About Us,"* https://www.comtell.com/Marketing/About-Us#:~:text=The%20Urner%20Barry%20Story,city%20from%20around%20the%20world. (last accessed Nov. 18, 2025).

    f.   How the product is being packed [prior to shipment].[55]

78.    Urner Barry continues to develop the platform, integrating additional data in order to best utilize the non-public information fed through and to Urner Barry's artificial intelligence after its various methods of data collection. For example, the platform now also analyzes:

    a.   Wholesale prices;

    b.   Price forecasts;

    c.   News;

    d.   Analysis; and

    e.   Weather Data.[56]

79.    According to Urner Barry, the "forecasting methodology blends macroeconomic and fundamental analysis, and technical insights, augmented by AI and curated by expert analysts."[57]

80.    Using all of this information, Expana's Urner Barry platform appears as follows:

---

[55] *"Urner Barry – A Division of Agribriefing Limited: Policies, processes and control activities relating to Urner Barry's selected price assessments and their adherence with the Internal Organization of Securities Commissions and Principles for Oil Price Reporting Agencies*," BDO (VIA URNER BARRY ONLINE) (Nov. 30, 2021), at https://www.urnerbarry.com/pdf/IOSCOAssurancereport.pdf, ("BDO Report").

[56] *"Expana Completes Forecasts for Urner Barry Price Benchmarks and Launches Groundbreaking New Platform*," EIN NEWSWIRE (ONLINE) (May 7, 2025), https://www.wjbf.com/business/press-releases/ein-presswire/810375006/expana-completes-forecasts-for-urner-barry-price-benchmarks-and-launches-groundbreaking-new-platform/.

[57] *Id.*



81. The collection of this data requires a large team of "market reporters, analysts, data scientists and correspondents [] dedicated to fulfilling the Urner Barry mission of providing timely, accurate and unbiased market to our subscribers on a daily basis."[58]  The reason for all of this is so that Egg producers (and others with financial motivations related to the success of pricing in the Relevant Market) can avoid market conditions which might trigger prices or supply that does not comport with what the Egg producers would want.  Urner Barry admits as much: "[w]e provide tailored solutions to negotiate with confidence, while minimizing risk and uncertainty to uncover the next growth opportunities."[59]

---

[58] *Id.*

[59] *Id.*

82.     The authenticity and the quality of the data is protected by Urner Barry's "Data Submitter Policy", which requires that submitters of data (here, Egg producers) to:

    a.  Provide authentic data in a timely manner and on a regular basis which is representative of their actual transactions;

    b.  Upload all market data that falls within the criteria outlined in methodology documents;

    c.  Provide data from their back-office systems;

    d.  Agree to provide all relevant information for a transaction which influences pricing of the commodity;

    e.  Refrain from submitting only selective samples of data in order to manipulate price assessments and market coverage;

    f.  Feel free to conduct business with a variety of market participants and then correspondingly disclose to Urner Barry whether the transaction was an inter-company transfer or was with a related party or affiliate; and

    g.  Prepare to divulge parameters of deals and data which Urner Barry seeks (including bids, offers, volumes, freight cost, specifications, delivery location and counter parties) which may effect the transactions' price.[60]

83.     According to BDO, the means to collect Urner Barry data into Urner Barry's "Ledger" system includes:

    a.  Phone interviews;

    b.  Face-to-face meetings;

    c.  Email;

---

[60] BDO Report, at 30.

d. Instant messaging platforms;

e. Fax; and

f. Online through Urner Barry's website.[61]

84.    All of this data, as well as the contemporaneousness of its collection as well as the quality of the provides tremendous value to Egg producers.  As recently as Winter of 2024, Mintec released a comprehensive report on their product offerings (*e.g.* Urner Barry) in the Urner Barry Reporter, stating the benefits as follows:

a. "Gain historic data and insights to anticipate crop quality and quantity, based on past performance, helping you make informed decisions."

b. "Understand market stability by assessing potential supply challenges, pricing fluctuations and disruptions, allowing you to proactively address these issues."[62]

85.    The most problematic aspects of this data collection are as follows: Urner Barry allows Egg producers to make sure that their bids and pricing for the sale of Eggs in the Relevant Market is consistent with their competitors – this is information that the Egg producers would not have but for participation by a substantial amount of Egg producers in Urner Barry's platform as well as a willingness by Egg producers to capitulate to the pricing quotations Urner Barry offers because of their faith that their competitors will do the same.

86.    As Professor Carstensen's analysis of Urner Barry's aspect to keep pricing uniform amongst Urner Barry's participants states: "it is almost certain that there is an understanding that if I provide this kind of data, you – the processor – will make sure that it gets shared only with those who are sharing their data […] [it means that egg producers have] much more of an

---

[61] BDO Report, at 32.

[62] Urner Barry's Reporter, (Online) (Winter 2024) (Vol. 19, No. 1), at https://www.urnerbarry.com/reporter/issues/ReporterV19N1_WEB.pdf.

understanding about how [to] share the information. Or that [they're] going to share confidential business information that will facilitate our making more sophisticated production decisions by letting each of us know what the other is doing in terms of adding to or reducing production. And that will mean we're much more likely to stabilize the quantity of eggs, reduce the quantity of eggs if necessary, in order to be able to maintain higher prices."[63]

87.    Indeed, Urner Barry's Egg industry reports include proprietary data on the quantity of chicks hatched to replace hen flocks – which allows Egg producers to be able to project what supply will be and to know what their competitors' forecasted supply will be.[64] As Professor Carstensen has stated with respect to this, "[because of Urner Barry, egg producers] know the timeline from hatch to the ability to lay the eggs. This would be very significant information in planning your own competitive strategy. If I [as an egg producer] know that you're ramping up your chicken supply, I know that you're expecting to add more eggs to the market down the road, and I can start retaliating."[65]

88.    Urner Barry offers the cleanest way for Egg Producers to fix prices without actually having to be in the same room as each other exchanging price and supply information. Through participation in Urner Barry's platform, as Professor Carstensen suggests, "[y]ou don't necessarily have to sit down with the other [producers] because you know what he's doing, he knows what you're doing. The agreement to exchange information, is what is in and of itself the source of the anticompetitive consequences."[66]

---

[63] "*Information Hub at Center of DOJ Investigation into Egg Pricing*," 13 CAPITAL FORUM 488, at 3 (June 9, 2025).

[64] *Id.*, at 2.

[65] *Id.*

[66] *Id.*, at 4.

89.    Indeed, the food industry does use Urner Barry as the basis for pricing agrifood items, like Eggs.  According to Spencer Wicks, chief executive officer of Mintec in 2024:

> [Our] proprietary prices are widely regarded as the industry standard within the agrifood industry.  Our rigorous assessment and market-leading number of […] assessments allow for risk management opportunities in the food-commodity community that were previously unserved by existing financial instruments.  This is underlined by the strong interest from the risk management industry to use Mintec's proprietary prices as the basis of their contracts.[67]

90.    At bottom, the Egg Producers (and their competitors) each know they cannot collaborate on pricing – but they delegate these decisions to Urner Barry so that they do not need to get their hands dirty.  Cal-Maine admits as much in its own Securities and Exchange Commission filings from 2024:

> Wholesale egg prices are volatile, cyclical and are impacted by a number of factors including consumer demand, seasonal fluctuations, the number and productivity of laying hens in the U.S. and outbreaks of agricultural diseases such as [Avian Flu]. We believe the majority of conventional shell eggs sold in the U.S. in the retail and foodservice channels are sold at prices that take into account, in varying ways, independently quoted wholesale market prices, such as those published by Urner Barry.[68]

91.    Critically, this short statement by the largest producer of Eggs in the United States brazenly acknowledges: (1) that the volatility of Egg prices in the Relevant Market is due to conditions beyond Defendants control; (2) that this volatility is addressed through selling Eggs at prices that take Urner Barry's price quotations into account; and, (3) that the majority of Eggs sold in the U.S. (in either retail or foodservice channels) are sold at prices dictated by Urner Barry.

---

[67] "*Mintec completes four IOSCO accreditation for proprietary agrifood prices,*" EIN Newswire (Online) (February 13, 2024), at https://www.ozarksfirst.com/business/press-releases/ein-presswire/688089970/mintec-completes-fourth-iosco-accreditation-for-proprietary-agrifood-prices/.

[68] S.E.C. FORM 10-K, CAL-MAINE FOODS INC. (June 1, 2024), at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000016160/000156276224000177/calm2024060110K.htm, at 5.

This underscores the profit producing motive of why each of the Egg Producers (and others) use Urner Barry's platform in the first instance.

92.     *Egg Producers Use Avian Flu As Cover for Price-Fixing.*    As stated herein, Defendants have used Avian Flu's elimination of egg laying hens as an excuse for why Egg prices are higher than what they ordinarily would be.

93.     The notion that Avian Flu would increase Egg prices as substantially as Egg prices have increased is both contextually and historically inaccurate.

94.     Contextually, Defendants generally promote the belief that lost flocks due to Avian Flu created a supply constraint (leading to higher prices), this too is inaccurate.  Across the United States, and as seen in the chart below, Egg production and supply has not deviated that significantly since the onset of the Avian Flu in February 2022 as to warrant the substantial price increases and fluctuations in the time period since February 2022.



95.    Additionally, the United States Bureau of Labor Statistics' data collection shows that egg prices have skyrocketed despite the inventory and supply of eggs during the Class Period remaining relatively consistent in the South/Southeastern United States:



96.    Historically, it is a generally accepted economic principle, according to agriculture economist Jayson Lusk, that a 1% decrease in supply will trigger a 6.6% increase in Egg prices.[69] This principle was proven correct in 2015, when Avian Flu had an earlier outbreak in the United States: prices rose about 7% for each 1% decrease in supply.[70]   However, from 2022-2024, for

---

[69] Claire Kelloway, "*Unscrambling the Price of Eggs*," WASHINGTON MONTHLY (ONLINE) (April 4, 2025), at https://washingtonmonthly.com/2025/04/04/unscrambling-the-price-of-eggs/#:~:text=Urner%20Barry%20compiles%20a%20so,distributors%2C%20exporters%2C%20and%20buyers.

[70] *Id.*

every 1% decrease in egg production, egg prices increased between 17-33%.[71]  Meanwhile, in context and during the Class Period, Egg producers like Cal-Maine increased Egg prices by as much as 270% in 2023 despite having zero Avian Flu outbreaks in their egg laying hen layers on Cal-Maine affiliated farms that same year.[72]

97.    This defies economics and it defies logic.

98.    Because Cal-Maine increased prices so substantially, it not only hurts consumers who bought Cal-Maine affiliated brands, but also triggered higher price quotations for other Egg producers (and their competitors) on the Urner Barry platform – further raising prices industrywide.

99.    In response to the Egg industry's price increases, other smaller (non-Defendant) Egg producers are baffled by price increases.  For example, the chief executive of Vital Farms, Russell Diez-Canseco, stated:

> It's a head scratcher for us.  I don't see anything in my cost structure that would have led me to raise our prices by [this much.].  We've taken just enough price to keep ourselves whole and continue to pay our farmers an appropriate profit for the work they do… I can't explain why prices have gone up as high as they have.[73]

100.    As has been commonly said in antitrust price fixing cases, a rising tide (or, in this case, Egg prices) raises all ships.

---

[71] *Id.*

[72] "*The Economic Cost of Food Monopolies: The Rotten Egg Oligarchy*," FOOD & WATER WATCH (ONLINE) (March 2025), at https://www.foodandwaterwatch.org/wp-content/uploads/2025/03/RPT2_2502_EconomicCostEggs.pdf.

[73] Brooke DiPalma, "*Vital Farms raised egg prices 'reluctantly and in small amounts'*: CEO" YAHOO! FINANCE (ONLINE) (January 28, 2023), at https://finance.yahoo.com/news/vital-farms-raised-egg-prices-reluctantly-and-in-small-amounts-ceo-132140110.html

*The Structure and Characteristics of the Egg Product Market Render the Conspiracy Plausible*

*The Egg Product Market is Concentrated*

101.    The Egg market is concentrated, with just a few producers controlling the majority of supply – for example, the top five Egg producers produce over 40% of the United States' Egg supply. This concentration is compounded by the fact that nearly all Egg producers determine their downstream pricing to customers off of the same Urner Barry price index. Specifically, the implications of this are that one large Egg producer can or could manipulate nearly the entire Egg industry's pricing based on their reporting to Urner Barry and the resulting reaction by Urner Barry's algorithm and reporting processes. Furthermore, because nearly the entire Egg industry takes guidance and belongs to UEP, the Relevant Market follows much of the same advice on critical topics (like marketing, messaging, price, production and supply) because they know that their competitors are doing the same.

*Egg Products Are Inelastic Commodity Products, Susceptible to Collusion*

102.    Highly concentrated markets, such as the Relevant Market, are more susceptible to collusive conduct. This is because market participants need only agree with, and monitor, UEP's guidance and Urner Barry's platform.

103.    Eggs are an inelastic commodity product and Egg products do not differ significantly in terms of quality, appearance, or use, rendering them fungible. Eggs are generally produced and sold to standard specifications and must adhere to the same guidance promulgated by the USDA for production, packing, labeling and packaging to be competitive.

104.    When products are interchangeable, companies generally are forced to win business from consumers by competing on price. Thus, cartels, such as here, are more likely to form between horizontal competitors selling interchangeable products as a means to avoid price-based

competition and because the cartel's members can more easily monitor and detect or police defections from a price-fixing agreement.

105.    Additionally, consumer demand for Egg products is relatively unaffected by price because Eggs are historically considered to be an inexpensive good.  Even when prices fluctuate, they comprise a small share of consumers' budgets.  Thus, pricing for Egg products is highly inelastic, in part, because there are no adequate substitutes.  Egg products are sold in virtually all restaurants and grocery stores throughout the United States as either "shell eggs" or processed Eggs.  Although there are potential substitute products, such as imitation Egg products, the characteristics of those products lack the unique characteristics of Egg products that make them attractive to customers.

*Egg Producers, including Defendants, Had Numerous Opportunities to Collude*

106.    Defendants, other Egg producers and UEP have and continue to have numerous opportunities to collude which are facilitated by Urner Barry or by UEP (which is comprised of Defendants and Egg producers themselves, these opportunities include:

   a.   **Urner Barry's platform**: Urner Barry allows Egg producers to have direct contact with Urner Barry's reporters (who then adjust the price index accordingly, as well as transmit daily videos, reports and other types of messages to Egg producers about pricing, supply and other highly confidential but relevant information).

   b.   **Urner Barry's Quarterly Reporter**: Urner Barry's Quarterly Reporter comes in the form of a magazine that discusses industrywide challenges and dynamics, as well as coordinates industrywide unified responses to these challenges and dynamics such as branding, price-related messaging and supply issues (using American Egg Board and UEP's help).

c. **UEP and Urner Barry's conferences**: Each year, UEP has several conferences and meetings, and Urner Barry has at least two conferences including the annual Executive Conference and the Global Protein Summit, as well as briefing meetings as needed.  Urner Barry describes these meeting as attended by "leaders of the egg … industry [who] have for years attended this meeting as a place for networking, inspiring keynotes and hands on market intel from Urner Barry reporters."[74] Specifically, during the Class Period, these conferences included:

   i. 2022 Urner Barry Executive Conference (located in Las Vegas, Nevada) from May 1, 2022 through May 3, 2022 – this conference was attended by hundreds of executives; and, om May 3, 2022, an "Eggs Roundtable" was held which discussed "different issues affecting animal proteins markets [and] how these will impact pricing… Areas to be discussed include market developments impacting pricing, changing consumer trends, export markets […] [w]ith so much volatility in the markets, this year's roundtable will feature insight [] on how to manage unpredictable commodity prices."

   ii. 2022 AEB & UEP Joint Annual Executive Conference (located in Charleston, South Carolina) from October 10, 2022 through October 14, 2022;

   iii. Urner Barry Global Protein Summit (located in Chicago, Illinois) from October 17, 2022 through October 19, 2022 – this conference was attended by hundreds of executives in the U.S. protein market, including Egg producers, on October 18, 2022, a panel led by Urner Barry's reporters

---

[74] Urner Barry's Reporter, (Online) (Winter 2024) (Vol. 19, No. 1), at https://www.urnerbarry.com/reporter/issues/ReporterV19N1_WEB.pdf., at 53.

discussed Avian Flu with an emphasis on "what could be next to impact supply, demand and protein prices, giving [Egg producers] the tools to navigate future volatility."

iv. 2023 UEP January Committee Briefings and Board Meeting during the last week of January 2023 – Cal-Maine's president and chief executive officer Sherman Miller provided opening remarks discussing the challenges related to Avian Flu (a picture of him giving these remarks and addressing his competitors on this challenge is below) as well as a briefing by Country Charm Eggs (acquired in 2023 by MPS Egg Farms) on four topics, including Egg market conditions.



v. 2023 Urner Barry Executive Conference (located in Las Vegas, Nevada) from April 30, 2023 through May 2, 2023.

vi. 2024 UEP January Committee Meetings (located in Atlanta, Georgia) during the last week of January 2024 – attended by over 300 UEP members, Avian Flu and Egg prices were key topics, including a speech by Versova

Eggs' chief financial officer Matt Dean presenting a position paper on Egg prices (a picture of him giving these remarks and addressing his competitors on Egg pricing is below).



vii. 2024 Urner Barry Executive Conference (located in Las Vegas, Nevada) from April 14, 2024 through April 16, 2024 – attended by over 400 executives who use Urner Barry where "[p]roducers, processors, buyers, brokers and association members [] join together to discuss industry trends and innovations… [to] spark[] meaningful connections, fostering invaluable collaborations and insights that leave a lasting impact on the industry."

viii. 2024 UEP Members' Legislative Board and Committee Meetings (located in Washington, D.C.) during the last week of May 2024 – the conference began with panels covering topics including "clarifying egg prices" in light of Avian Flu.

ix. 2024 UEP Area Briefings (four virtual sessions) on August 20, 2024 and August 21, 2024 – attended by over 400 UEP members to primarily discuss Avian Flu-related challenges to the Egg industry.

x.   Expana (formerly Urner Barry's) Global Protein Summit/Agri-Food Americas 2024 Conference (located in Chicago, Illinois) – attended by Egg producers and highlighted by agenda topics such as the "price forecasting power hour" and the 2025 macroeconomic outlook.

xi.   2024 AEB & UEP Joint Annual Executive Conference (located in Colorado Springs, Colorado) from October 14, 2024 through October 17, 2024 – the focus of this meeting, in part, was "shaping the future of U.S. egg production."

xii.   2025 UEP January Meeting during the last week of January 2025 – over 300 UEP members participated in meetings chaired by NuCal's president Mike West and focused almost exclusively on topics related to "the ongoing challenges" of Avian Flu.

xiii.   2025 UEP Legislative Board and Committee Meetings (located in Washington D.C.) during May 2025 – UEP's consultants Randy Green and Louie Perry led topic-based discussions including on Avian Flu, vaccination strategy, egg prices and hatchery surplus (*e.g.* supply of egg laying hens).

107.   As a result of these meetings, issuances of reports, following Urner Barry's pricing platform and other opportunities to collude, all of the players in the Egg production market benefit financially.

*The Egg Product Market Has High Barriers to Entry*

108.   A collusive agreement among horizontal competitors would typically attract new market entrants.  However, high barriers to entry in the Relevant Market have prevented new firms from meaningfully entering and penetrating the market.

109.    Any new entrant in the Egg industry would need to invest significant start-up capital on pullets (where Egg laying hens are kept), abide by highly complex regulations, own plants and specialized equipment for processing, labor, infrastructure for vertically integrated distribution and staff for oversight and regulatory compliance.

110.    As a result, new competitors are prevented from responding to the supra-competitive industry prices caused by Defendants, UEP's and co-conspirators price-fixing agreement by entering the market.

*Relevant Market*

111.    Insofar as Plaintiffs are required to plead the relevant product and geographic markets to establish antitrust standing for the violations alleged herein, Plaintiffs allege the relevant markets at issue and have pleaded how Defendants' conduct harmed competitive processes in these markets.

112.    *Relevant Geographic Market.*  The Relevant Geographic Market is the market for Eggs in the United States.

113.    *Relevant Product Market.*  The Relevant Product Market is the market for Eggs, specifically, shell eggs and egg products.  Shell eggs are comprised of "table eggs" (eggs which are purchased by retail entities, like grocery stores, to resale to the consuming public) and "breaking eggs" (eggs which are purchased by food service entities for processing).  Generally, egg products are defined as breaking eggs which have been removed from their shells and then processed into dried, frozen or liquid form.

114.    Eggs (and egg products) cannot be reasonably replaced or substituted with a similar product.  Because there are no substitute for Eggs, the demand for Eggs is relatively inelastic – that is, consumers do not refrain from buying eggs when prices rise (even substantially).  At least

one Defendant (Cal-Maine) admitted this.  In January of 2025, Cal-Maine wrote in its investor presentation: "[t]he price of eggs in relation to the overall amount we spend on groceries does not matter.  A $1-2 increase in an item we purchase once a month is not that big of a deal in the grand scheme of things."[75]

115.    Many consumers (like Plaintiffs) use shell eggs in order to prepare egg dishes at home, egg products also play a vital role in the commercial food manufacturing industry, for food service industry operators and others.  In the commercial food manufacturing industry, Egg products are used as a key binding ingredient in baked goods or in other items such as mayonnaise (egg whites), pasta and salad dressings.  Food service industry operators use egg products in their restaurants, fast food chains, hospitals, schools and nursing homes.  As such, the production, processing, packaging and distribution of eggs constitute and affect a substantial portion of interstate trade and commerce.

116.    *Market Power.*  The Relevant Market is highly concentrated.  Upon information and belief, the top five egg producers own about 40% of the entire United States flock of egg laying hens – three of which are defendants in this Action, Cal-Maine (13%), Rose Acre (8%) and Hillandale (6%).

117.    Additionally, at least 90% of the producers in the Relevant Market belong to UEP.  UEP not only acts as a unified voice for the entire Egg industry, but also has partnerships with vendors (like Urner Barry) that supply UEP's members.

118.    A second indicia of market power is the ability to control prices of a commodity.  Because nearly the entire Relevant Market follows Urner Barry's guidelines (and followed Urner

---

[75] Cal-Maine, 2Q 2025 INVESTOR PRESENTATION (JANUARY 2025) (Online), at https://irp.cdn-website.com/79e86203/files/uploaded/CALM_FY25_2Q_Investor_Presentation_Accessible.pdf, at 14.

Barry's guidelines), the changes in price for the industry are impacted by the price quotations, output reporting and supply statistics provided to Urner Barry. This too bodes in favor of a highly concentrated market – because nearly all of the Relevant Market follows the same guidance that sets pricing. According to an antitrust attorney's advocacy letter to the Federal Trade Commission, Cal-Maine, "the leader in a mostly commoditized industry, with, presumably, the most efficient operations and the greatest financial power," was able to act the industry's leader to quintuple its profit margins during the Class Period "using the avian flu outbreak and [] inflationary conditions [] to establish a new 'focal point' for egg prices, one that will not only pass through cost inflation, but also radially enhance the industry's pre-2022 profit margins."[76]

119. *Hypothetical Monopoly Test.* The Relevant Market satisfies the test for market definition used by the federal antitrust enforcement agencies known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%) non-transitory increase in price (a "SSNIP"), without causing a significant number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If not, the market is too narrowly defined and it does not encompass sufficient economic substitutes.

120. Here, the SSNIP test is satisfied, and the market is properly defined.

121. As described both above and below, the Egg Producers (with the assistance of Urner Barry) have been able to increase the price of eggs exponentially over the Class Period. This can be seen below by way of the United States' Bureau of Labor Statistics' Consumer Price Index for the sale of eggs:

---

[76] Basel Musharbash, "*Letter to FTC Chair Lina Khan: Price Gouging and Collusion in Shell Eggs Sector*," (January 19, 2023), at https://farmaction.us/wp-content/uploads/2023/01/Farm-Action-Letter-to-FTC-Chair-Lina-Khan.pdf.



122.    Yet, despite these unnatural price increases, Egg producers have not lost market share.  The reason for this is simple: Egg producers collectively make more money when they neutralize price competition and coordinate pricing.  Through the coordination of this pricing using Urner Barry's tools, Egg Producers can fix, raise, maintain and/or stabilize the price of eggs that they produced in the United States.

<u>*Antitrust Injury*</u>

123.    The price of Eggs are substantially and artificially elevated during the Class Period as a result of Defendants' conduct.  This was contrary to pricing patterns prior to the Class Period and is contrary to the economics discussed above.

124.    Defendants' anticompetitive conduct had the following effects, among others:

a.    Price competition has been restrained or eliminated with respect to Egg products;

b.    The prices of Egg products have been fixed, raised, stabilized other otherwise maintained at artificially inflated levels;

c. Indirect purchasers of Eggs have been deprived of free, fair and open competition; and

d. Indirect purchasers of Eggs paid artificially inflated Egg prices.

125. The purpose of the conspiratorial conduct of Defendants, UEP and their co-conspirators was to fix, raise, maintain or stabilize the price of Eggs despite fluctuations in the Relevant Market caused by confounding variables, such as weather, Avian Flu or changes in consumer taste. As a direct and foreseeable result of Defendants' conduct, Plaintiffs and Class members have paid supra-competitive prices for Eggs during the Class Period.

126. By reason of the violations of the antitrust laws alleged herein, Plaintiffs and Class members have sustained injury to their business or property, having paid higher or supra-competitive prices for Eggs than they would have paid in the absence of Defendants' illegal contract, combination of conspiracy. As a result, Plaintiffs and Class members have suffered damages.

127. This is the type of antitrust injury that the antitrust laws were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

<u>*Government Investigations and Recidivist Conduct*</u>

128. The United States Department of Justice has now acted these issues, issuing subpoenas to at least two Egg Producers (Cal-Maine and Rose Acre) in an effort to learn more about collusive conduct and price fixing in the Relevant Market.[77] Additionally, the Egg Producers

---

[77] Dave Michaels and Patrick Thomas, *"Justice Department Opens Probe of Sharp Surge in Egg Prices: Antitrust enforcers are investigating whether large producers have engaged in anticompetitive conduct,"* THE WALL STREET JOURNAL (ONLINE) (March 7, 2025), at https://www.wsj.com/business/egg-prices-justice-department-probe-22d6a4f6.

are recidivist antitrust actors, having been sued numerous times before for similar price fixing conduct and even losing at trial for this type of conduct as recently as 2023.[78]

129.    In a letter by over a dozen members of Congress to President Trump seeking action by the Department of Justice on Egg pricing, United States Senator Elizabeth Warren focused intently on the issues discussed herein: "[e]gg producers […] leverage the current avian flu outbreak as an opportunity to further […] hike up egg prices to increase profits." As United States Senator Jack Reed had stated in February of 2023, "[w]hile the wholesale price of eggs is tied to the Urner Barry index, the dozen largest egg producers have the ability to feed data into the index that could result in beneficial pricing for the industry."[79]

130.    Because of the nature of price fixing in modern times, data aggregators which collect information on output, supply and price – like Urner Barry does – have become a key focus of the Department of Justice to crack down on price fixing in food commodity cases. For example, the Department of Justice filed an antitrust lawsuit against Agri Stats, a data aggregation company in the meat industry, for violating the Sherman Act by acting as a facilitator for meat companies to fix prices.[80]

131.    At the time of filing the Agri Stats case, United States Assistant Attorney General Jonathan Kanter of the Department of Justice's Antitrust Division stated "[t]he Justice Department is committed to addressing anticompetitive information exchanges that result in consumers paying

---

[78] *See, e.g., Kraft Foods Global, Inc, et al. v. United Egg Producers, Inc., et al.*, Case No. 1:11-cv-08808 (N.D. Ill. 2011).

[79] Sen. Jack Reed, "*Reed: Industrial Egg Producers Price Hikes Are Suspiciously High & Federal Government Should Help Rein in Unfair Market Prices*," PRESS RELEASE (ONLINE) (February 6, 2023), at https://www.reed.senate.gov/news/releases/reed-industrial-egg-producers-price-hikes-are-suspiciously-high-and-federal-government-should-help-rein-in-unfair-market-practices.

[80] *United States of America v. Agri Stats, Inc.*, Case No. 0:23-cv-03009 (D. Mn. 2023), at ECF No. 1.

more for chicken, pork and turkey.  This case is the latest effort by the Justice Department to protect American consumers, farmers and workers from anticompetitive practices in the agriculture industry."[81]

132.    It should come as no surprise then that the Department of Justice is now investigating (and could be inclined to file an antitrust lawsuit against) Urner Barry.  As antitrust Professor Carstensen stated, the information collected and shared by Agri Stats is "very, very similar" to that of Urner Barry.[82]

### *Capper-Volstead Immunity Does Not Apply*

133.    The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146)(7 U.S.C. §§ 291, 292), grants certain agricultural producers an exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products.  Capper-Volstead Act, § 1.  These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." *Id.*

134.    The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would run afoul of the Sherman Act.

135.    Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural

---

[81] United States Department of Justice, "*Justice Department Sues Agri Stats for Operating Extensive Information Exchange Among Meat Producers*," DOJ PRESS RELEASE (ONLINE ARCHIVE) (Sept. 28, 2023), https://www.justice.gov/archives/opa/pr/justice-department-sues-agri-stats-operating-extensive-information-exchanges-among-meat.

[82] "*Information Hub at Center of DOJ Investigation into Egg Pricing*," 13 CAPITAL FORUM 488, AT 1 (June 9, 2025).

products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

136.    Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to cooperatives that afford equal corporate suffrage rights to its members, providing "that no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein." The limited protections of the Capper-Volstead Act evaporate unless the organization engaging in the coordinated efforts is exclusively made up of producers. If even one member of a cooperative organization is not a producer, the limited protection of the Capper-Volstead Act will not apply. Even if an individual producer independently qualifies as a Capper-Volstead entity, that individual producer loses Capper-Volstead immunity upon conspiring with a non-Capper-Volstead entity.

137.    The plain language of the Capper-Volstead Act affords no immunity for pre-production output restraints: Congress did not grant the cooperatives the power to restrict supply, only the power to assist producers in marketing the available supply of agricultural products. USDA itself has recognized in various published documents that it is illegal for cooperatives to restrain members' production.

138.    Here, Capper-Volstead flatly does not apply.

139.    The activities of the Egg Producers were anticompetitive and predatory. The Defendants' conduct does not include activities that promote market efficiency and have no legitimate business justification. The sole purpose of the conspiracy is to artificially increase the downstream sales price of eggs in the United States.

140.    Further, the Egg Producers each participate in the downstream processing, marketing and transportation of their products, which means that they are not Capper-Volstead protected entities either.

## CLASS ACTION ALLEGATIONS

141.    This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23, Rules 23(a), 23(b)(1) and 23(b)(2).  Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals.  The nationwide class Plaintiffs seek to represent is defined as follows:

> **Nationwide Class.**  All natural persons, businesses, entities and corporations in the United States who indirectly purchased the Defendants' or co-conspirators' Eggs or Egg products (including prepared foods containing Eggs or Egg products) beginning on February 1, 2022, through the present day.

142.    In the alternative to the nationwide class, Plaintiffs seek to represent the following statewide sub-class pursuant to Federal Rules of Civil Procedure, Rules 23(a) and 23(b)(3):

> **State Sub-Classes.**  All natural persons, businesses, entities and corporations in the *Illinois Brick*-repealer statute states who indirectly purchased the Defendants' or co-conspirators' Eggs or Egg products (including prepared foods containing Eggs or Egg products) beginning on February 1, 2022, through the present day.[83]

143.    Excluded from the Classes are (1) Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (2) Plaintiffs' counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

144.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

---

[83] *Illinois Brick*-repealer states include: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

145.     *Numerosity.*  Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants or others.  Plaintiffs believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States, such that joinder of all Class member is impracticable.

146.     *Typicality.*  Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the anticompetitive conduct as alleged herein.  Plaintiffs, like all other Class members, were injured by Defendants' uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of himself and all other Class members, such that there are no defenses unique to Plaintiffs.  The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

147.     *Commonality.*  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

     i.   Whether Defendants and their co-conspirators engaged in an agreement, combination or conspiracy to fix, raise, maintain or stabilize prices of Eggs sold in interstate commerce in the United States;

     ii.  The duration of the conspiracy or agreement alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

     iii. Whether the conspiracy violated the federal and state antitrust laws;

     iv.  Whether Defendants were unjustly enriched;

     v.   Whether Plaintiffs were harmed;

vi.   Whether Plaintiffs are entitled to declaratory relief and injunctive relief to end Defendant's conduct; and

vii.  The appropriate class-wide measure of damages as well as whether Plaintiffs and Class members are entitled to such damages and other relief.

148.   *Adequacy of Representation.*   Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.   The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class.   Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

149.   *Superiority of Class Action.*   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.   In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

150.   The litigation of the claims brought herein is manageable.   Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

151.    Adequate notice can be given to Class members directly using information maintained in the parties' records.

152.    *Predominance.*  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

153.    This proposed class action does not present any unique management difficulties. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### COUNT I: PRICE FIXING

SECTION 16 of CLAYTON ACT FOR VIOLATION OF SECTION 1 of SHERMAN ACT

(FOR INJUNCTIVE RELIEF AND A DECLARATORY JUDGMENT)

154.    Plaintiffs reallege and repeats each and every allegation from paragraphs 1-153 as if fully realleged and set forth herein.

155.    From at least February 1, 2022, until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade in violation of the Sherman Act.

156.    Defendants did this by artificially restraining competition with respect to the price of Eggs sold within the United States; Defendants created a cartel which has caused Plaintiffs and Class members to suffer overcharge damages.

157.    There are no procompetitive justifications for Defendants' price-fixing agreements, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

158.    Defendants' cartel is unlawful under a *per se* mode of analysis.

159.    In the alternative, Defendants' cartel is unlawful under a quick look or rule of reason mode of analysis.

160.    Defendants' conduct caused Plaintiffs and Class members to pay supracompetitive prices for eggs in the Relevant Market.

161.    Defendant's conduct has a substantial effect on interstate commerce.

162.    Plaintiffs have suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent.  Plaintiffs have also been harmed by loss of competition in the Relevant Market due to Defendants' conduct.

163.    Plaintiffs seek injunctive relief, a declaratory judgment as well as costs and attorneys' fees, with respect to this cause of action.

## SECOND CAUSE OF ACTION

## COUNT II: UNLAWFUL INFORMATION EXCHANGE

SECTION 16 of CLAYTON ACT FOR VIOLATION OF SECTION 1 of SHERMAN ACT

(FOR INJUNCTIVE AND EQUITABLE RELIEF)

164.    Plaintiffs reallege and repeats each and every allegation from paragraphs 1-153 as if fully realleged and set forth herein.

165.    Beginning at a time currently unknown to Plaintiffs, but as late as February 1, 2022, and continuing through the present day, Defendants and their co-conspirators entered into continuing agreement to regularly exchange detailed, timely, competitively sensitive information which is non-public and is about their operations.  This agreement is an unreasonable restraint of trade under the Sherman Act.

166.    The information regularly exchanged by Defendants pursuant to the agreement has consisted and does consist of information about supply, output, production and pricing of Eggs. Defendants' regular information exchanges through Urner Barry and/or Expana reflected an independent concerted action between horizontal competitors in the Relevant Market.  Indeed, each Egg producer defendant furnished competitively sensitive information with the understand it would be reciprocated.  Urner Barry and/or Expana enforced this understanding by requiring Defendants to share data in order to receive comparable data.

167.    The agreement to regularly exchange this information through Urner Barry and/or Expana about production, supply and price suppressed competition between the Defendants and could not have been done without the assistance of Urner Barry and/or Expana.

168.    Accordingly, Defendants used the data obtained through Urner Barry and/or Expana to reduce the uncertainty that they would have individually faced from not knowing what their competitors were offering and providing in terms of price in the market for Eggs.  This strategic information was a material factor in the decisions to inflate prices that Plaintiff paid for Eggs during the Class Period.

169.    Defendants' unlawful agreements to exchange, and the actual decision to exchange, this data was not reasonably necessary to further any procompetitive purpose.  The information exchange has had the effect of (1) reducing and suppressing competition among Defendants in the market for eggs and (2) inflating the price of eggs during the Class Period.  As a result of this conduct, Plaintiffs and Class members have been injured in their business or property by paying artificially inflated prices for eggs during the Class Period.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF THE STATE ANTITRUST LAWS

RESTRAINTS OF TRADE

(FOR DAMAGES)

STATE SUBCLASSES

170.    Plaintiffs reallege and repeats each and every allegation from paragraphs 1-153 as if fully realleged and set forth herein.

171.    The anticompetitive conduct as alleged herein violates the state antitrust laws of the following states for the same reason that they violate federal antitrust laws:

### *Arizona's Uniform State Antitrust Act (Ariz. Rev. Stat. § 44-1401)*

172.    *Arizona*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

173.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

174.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *California's Cartwright Act (Cal. Bus. & Prof. Code § 16700)*

175.    *California*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

176.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

177.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Connecticut's Antitrust Act (Conn. Gen. Stat. § 35-24)*

178.    *Connecticut*.   As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

179.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

180.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The District of Columbia Antitrust Act (D.C. Code § 28-4501)*

181.    *District of Columbia*.   As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

182.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

183.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201(2))*

184.    *Florida*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

185.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

186.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/3(1))*

187.    *Illinois*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

188.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

189.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Iowa Competition Law (Iowa Code § 553.1)*

190.    *Iowa*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

191.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

192.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Kansas Restraint of Trade Act (Kan. Stat. Ann. § 50-101)*

193.    *Kansas*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

194.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

195.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Maine's Antitrust Statute (Me. Rev. Stat. Ann. Title 10 § 1101)*

196.    *Maine*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

197.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

198.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Maryland's Antitrust Statute (Md. Code Ann. § 11-204(a))*

199.    *Maryland*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

200.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

201.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.771)*

202.    *Michigan*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

203.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

204.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Minnesota Antitrust Law (Minn. Stat. § 325D.49, et seq. & 325D.57)*

205.     *Minnesota*.    As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

206.     Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

207.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Mississippi's Antitrust Statute (Miss. Code Ann. § 75-21-1)*

208.     *Mississippi*. As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

209.     Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

210.     During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Nebraska Junkin Act (Neb. Rev. Stat. § 59-801)*

211.    *Nebraska*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

212.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

213.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Nevada Unfair Trade Practices Act (Nev. Rev. Stat. § 598A.010)*

214.    *Nevada*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

215.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

216.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *New Hampshire's Antitrust Statute (N.H. Rev. Stat. Ann. Title XXXI § 356)*

217.    *New Hampshire*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

218.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

219.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The New Mexico Antitrust Act (N.M. Stat. Ann. § 57-1-1)*

220.    *New Mexico*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

221.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

222.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Section 340 of New York's General Business Law (N.Y. Gen. Bus. Law § 340)*

223.    *New York*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

224.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

225.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The North Carolina General Statutes (N.C. Gen. Stat. § 75-1)*

226.    *North Carolina*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

227.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

228.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The North Dakota Uniform State Antitrust Act (N.D. Cent. Code § 51-08.1-01)*

229.    *North Dakota*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

230.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

231.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *Oregon's Antitrust Law (Or. Rev. Stat. § 646.705)*

232.    *Oregon*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

233.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

234.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Puerto Rican Anti-Monopoly Act (P.R. Laws Title 10 § 260)*

235.    *Puerto Rico*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

236.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

237.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Rhode Island Antitrust Act (6 R.I. Gen. Laws § 6-36-1)*

238.    *Rhode Island*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

239.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

240.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *South Dakota's Antitrust Statute (S.D. Codified Laws § 37-1-3.1)*

241.    *South Dakota*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

242.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

243.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Tennessee Trade Practices Act (Tenn. Code § 47-25-101)*

244.    *Tennessee*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

245.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

246.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### The Utah Antitrust Act (Utah Code Ann. § 76-10-3101)

247.    *Utah*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

248.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

249.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### West Virginia's Antitrust Statute (W. Va. Code § 47-18-1)

250.    *West Virginia*.  As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

251.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

252.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.  Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

### *The Wisconsin Antitrust Act (Wis. Stat. § 133.01)*

253.    *Wisconsin*.    As stated, both above and below, Defendants have unlawfully restrained trade in the Relevant Market through price fixing agreements.

254.    Defendants' conduct has had the following impacts: price competition for Eggs in the Relevant Market were and are restrained, suppressed and eliminated leading to higher, supracompetitive prices for indirect purchasers of Eggs.

255.    During the Class Period, Defendants' unlawful conduct substantially impacted commerce, including in this state or territory.    Accordingly, Plaintiffs and Class members seek all forms of available relief under this statute.

## FOURTH CAUSE OF ACTION

### UNJUST ENRICHMENT

### (FOR DISGORGEMENT OF PROFIT

### AND THE CREATION OF A CONSTRUCTIVE TRUST)

### NATIONWIDE CLASS

256.    Plaintiffs reallege and repeats each and every allegation from paragraphs 1-153 as if fully realleged and set forth herein.

257.    Plaintiffs and Class members paid higher prices for Eggs in the Relevant Market.

258.    Plaintiffs and Class members paid higher prices that what would have otherwise occurred in a market free of Defendants' conduct.

259.    Plaintiffs and Class members conferred a benefit upon Defendants with their money.    Specifically, they paid for Eggs.    In exchange for paying for Eggs, Plaintiff and Class members received eggs.    Defendants knew that Plaintiffs and Class members conferred a benefit which Defendants directly accepted.    Defendants profited heavily from these transactions.

260.    Defendants would not have profited as much as they have and continue to profit but for their anticompetitive conduct, for which Plaintiffs and Class members were entirely unaware.

261.    Under principles of equity and good conscience, Defendants should not be entitled to retain the money made through these unconscionable acts.

262.    Plaintiffs and Class members have no other adequate remedy at law.

263.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered injury (and will continue to suffer injury) including in the form of higher prices in the Relevant Market.

264.    Defendants should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust, for the benefit of Plaintiffs and the Class members.  In the alternative, Defendants should be compelled to return or refund the amounts that Plaintiff and Class members overpaid for Defendants' Eggs.

## **DEMAND FOR RELIEF**

265.    To remedy these illegal acts, Plaintiffs request the following relief:

a.    Certify the Class and appoint Plaintiffs as the Class' representatives;

b.    Declaring, finding, adjudging and decreeing that the agreement of Defendants is unlawful and violates the federal and state antitrust laws and, therefore, must either result in a permanent divestiture or is enjoined;

c.    Awarding to Plaintiffs the costs of their suit, including reasonable attorneys' fees;

d.    Awarding to Plaintiffs their damages, in the amount to be determined by a jury, inclusive of treble damages as provided by the antitrust laws;

e.   Granting to Plaintiffs and Class any such and other relief to which they may be entitled and which this Court deems just and proper.

## **JURY TRIAL DEMANDED**

266.   Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

**DATED:** Nov. 18, 2025

Respectfully submitted,

By: /s/ *Blake Hunter Yagman*
Blake Hunter Yagman
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
1330 Ave. of the Americas, Suite 23A
New York, New York 10019
Tel.: (929) 709-1493
*byagman@sshhzlaw.com*

*Attorney for Plaintiffs Tariq Habash, Delia Govea, Andrew Phillips, and Catalina Torres and the Proposed Classes*